United States District Court
Middle District of Florida
Jacksonville Division

**CHARLIE JAMES THOMAS, JR.,**

    *Plaintiff,*

v.                                                                                                                              No. 3:19-cv-943-J-PDB

**COMMISSIONER OF SOCIAL SECURITY,**

    *Defendant.*

___

# Order

Charlie James Thomas, Jr., brings this action under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security denying his application for disability benefits. Under review is a decision by an Administrative Law Judge ("ALJ") dated September 27, 2018. Tr. 8–25. Summaries of the law and the administrative record are in the ALJ's decision, Tr. 11–20, and the parties' briefs, Doc. 19, Doc. 21, and not fully repeated here.

### I.    Background

Thomas was born in 1971. Tr. 88. In 1994, as a result of a car accident, he had upper-cervical-vertebrae surgery (a posterior decompression and fusion). Tr. 366. He could work but continued to have chronic "waxing and waning pain" and receive other treatment like medication and injections. Tr. 366. His last job was for a railroad company as a yard-truck driver and "tie-down man," which required him to walk along the tracks to check hitches. Tr. 56–57.

On April 23, 2015, Thomas was in a second car accident, this time at work. Tr. 336. He received worker's compensation benefits until March 2016 and, shortly after those ended, applied for disability benefits, alleging he could not work since the date

of the second accident. Tr. 88–89, 187. Reports document his complaints that the second accident aggravated his earlier neck and back injuries. Tr. 366.

Before and after the second accident, Thomas saw Jawad Hussain, M.D., and other providers at the Institute of Pain Management and Integrated Pain Services for pain management and Kenneth Mayer, M.D., at Baptist Primary Care for primary care, including for diabetes treatment. After the second accident, he saw (1) Robert Hurford Jr., M.D., with Heekin Orthopedic Specialists or Southeast Orthopedic Specialists four times between June and November 2015, and (2) Frank Collier, Jr., M.D, with Collier Spine Institute & Rehabilitation Medicine seven times between April and July 2016 for regular appointments and injections.

An April 2016 report from Dr. Collier states, "[Dr. Hurford] felt that [Thomas] might be a surgical candidate and had recommended surgery. His work comp provider had obtained a second opinion by Dr. Monteiro who checked the before and after MRI scans and felt that his condition that needed surgery was present prior to his injury on the job and was not related to his job accident." Tr. 366. A July 2016 report from Dr. Collier states, "[Thomas] has also been evaluated per Dr. Hurford and Dr. Monteiro who possibly recommended additional surgical intervention from a cervical standpoint but he is not interested in a surgical evaluation or intervention at this point. He may be interested in a third epidural injection on the left but not today. He would like to have his right shoulder treated first. He is not actively engaged in any formal PT nor is he interested in therapy." Tr. 369.

At a hearing before the ALJ, Thomas explained he is now covered under his wife's private insurance. Tr. 56. When the ALJ asked why Thomas cannot work fulltime, Thomas answered in part, "[A]fter the accident at the railroad they went [sic] to have my whole spine fused together, you know, and it's like which way do I go? Do I accept the surgery, or do I sit here and hurt? Do I not provide for my family, you know, and it's like, you know, the mobility issues, and trying to walk, trying to stand, trying to sit, everything just – it's out of whack right now." Tr. 62.

2

The ALJ found Thomas has severe impairments of "disorders of the spine," diabetes mellitus, and gout. Tr. 13. She found Thomas has the residual functional capacity ("RFC") to perform light work with additional limitations:

> He can occasionally lift up to 20 pounds; frequently lift/carry up to 10 pounds; never climb ladders/ropes/scaffolds but can occasionally climb ramps/stairs; occasionally balance, stoop and crawl; frequently kneel and crouch; frequently reach (including overhead) with the right dominant upper extremity; occasionally reach (including overhead) with the left upper extremity; must avoid concentrated exposure to extreme cold, extreme heat, wetness or humidity, poorly ventilated areas and environmental irritants such as fumes, odors, dusts and gasses; must avoid all exposure to vibration, the use of moving machinery and exposure to unprotected heights.

Tr. 14.

The ALJ found Thomas is unable to perform his past relevant work but can work as an assembler, marker, and blade balancer, and those jobs exist in significant numbers in the national economy. Tr. 19. The ALJ therefore found Thomas not disabled. Tr. 19–20.

## II.   Standard

A court's review of a decision by the Commissioner is limited to whether substantial evidence supports the factual findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoted authority omitted). The "threshold for such evidentiary sufficiency is not high." *Id.*

With limited exceptions, a claimant may present new evidence at each stage of the administrative process, including before the Appeals Council. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007). While the Appeals Council

may decline to review the ALJ's denial of benefits, it "must consider new, material, and chronologically relevant evidence" a claimant submits. *Id.* Whether additional evidence meets this standard is a question of law subject to de novo review. *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1321 (11th Cir. 2015). Evidence is material if there is a reasonable probability it would change the administrative result. *Id.*

"[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). An erroneous factual statement by an ALJ may be harmless if the ALJ applies the proper legal standard. *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983); *Majkut v. Comm'r of Soc. Sec.*, 394 F. App'x 660, 665 (11th Cir. 2010).

## III.   Law & Analysis

### A.   *Reaching Limitations in the RFC*

Thomas contends the reaching limitations in the RFC (limited to frequently reaching with the right dominant upper extremity and occasionally reaching with the left upper extremity) are not supported by substantial evidence.[1] Doc. 19 at 14–15.

A claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). The Social Security Administration uses the RFC at step four to decide if the claimant can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy [he/she] can perform. *Id.* § 404.1545(a)(5). The "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine

---

[1] Thomas summarizes the issue as "[w]hether or not the vocational hypothetical relied upon by the ALJ comprehensively describes Plaintiff's impairments." Doc. 19 at 14.

4

RFC findings. *Moore v. Barnhart,* 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). The ALJ need not defer to an opinion about the RFC. 20 C.F.R. § 404.1527(d)(3).

At step five, an ALJ must decide whether a significant number of one or more jobs that the claimant can perform exist in the national economy. *Id.* § 404.1566(b). An ALJ may use a vocational expert's testimony for that finding. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011). For a vocational expert's testimony to be substantial evidence, the ALJ must pose a hypothetical question that includes all of the claimant's impairments. *Id.* An ALJ is "not required to include findings in the hypothetical that he had properly rejected as unsupported." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).

Thomas contends that although the ALJ discussed slightly decreased left grip strength and troubled fine-finger movements, the ALJ failed to address his "reduced capacity to perform activities involving flexion (i.e., bending around a joint) [and] his reduced ability for extension (i.e., straightening or extending a flexed limb). (Tr. 83, 349, 555)."[2] Doc. 19 at 15. He adds, "The ALJ's rationale simply did not appreciate plaintiff's '[s]evere limitation with lateral rotation' in the left hand (Tr. 341) nor his problem with decreased 'proprioception', a term which refers to a lack of awareness of body position (Tr. 342) or 'in-coordination' (Tr. 344, 346)."[3] Doc. 19 at 15. He

---

[2]The document at page 83 of the administrative transcript is Thomas's attorney's statement at the administrative hearing about medical evidence. The document at page 349 of the administrative transcript is the last page of a report from an October 2015 appointment with Dr. Hurford. The report includes a clinical assessment describing "symptoms consistent with cervical myeloradiculopathy" including "[n]eck pain, headaches, left arm pain, upper extremity weakness, loss of fine motor coo[r]dination, loss of balance, gait abnormality secondary to cervical spinal stenosis compressing the spinal cord from C3 to T1," and a patient plan recommending surgery to decompress the spinal cord. Tr. 349. The document at page 555 of the administrative transcript is from a May 2016 report from the Institute of Pain Management documenting decreased flexion and extension, both with pain, in Thomas's cervical spine in a musculoskeletal exam.

[3]The documents at pages 341 and 342 of the administrative transcript are from a report of a November 2015 appointment with Dr. Hurford. Based on a physical exam, under "Restrictions," the report states, "Severe limitation with lateral rotation." Tr. 341. The report does not mention Thomas's left hand in connection with his lateral rotation. *See generally* Tr.

5

contends the ALJ's rationale fails to provide "substantial support for the ALJ's finding that plaintiff is <u>only</u> limited to 'occasional' activities associated with left upper extremity reaching. Even if plaintiff could 'reach' as suggested by the ALJ, there is no substantial support for how the plaintiff might be expected to perform left handed reaching activities requiring some bending, lateral rotation or extension with decreased proprioception (i.e., awareness of body position)." Doc. 19 at 15 (emphasis in original). He contends a difficulty in raising his right arm beyond 30 degrees (citing Tr. 378) also is inconsistent with the RFC.[4] Doc. 19 at 15.

Substantial evidence supports the ALJ's limitations on reaching. In a discussion of the medical evidence, Tr. 15–17, the ALJ discussed Thomas's left upper extremity issues (summarizing from different appointments "cervical spine pain with

---

341. The statement follows headings "Cervical Spine Evaluation" and "Range of Motion-Measurement" and appears to be part of a cervical spine evaluation. Tr. 340–41. Under "Clinical Assessment," Dr. Hurford writes, "Clinical examination reveals grossly apparent Hoffman's reflexes bilaterally, a left inverted radial reflex, decreased fine motor coordination of the left hand, decreased proprioception, a broad-based gait pattern, weakness in left hip flexion, and weakness in his left supraspinatus, infraspinatus, interossei, and grip strengths." Tr. 342.

The documents at pages 344 and 346 of the administrative transcript are from a report of the October 2015 appointment with Dr. Hurford. Under "History of Present Illness" for neck pain, the report states, "Aggravating factors include flexion, lifting and rotation. Denies relieving factors. Associated symptoms include decreased mobility, incoordination, loss of balance, numbness, tingling, weakness, headaches and loss of fine motor coordination." Tr. 344. In a "Review of Systems," Thomas was positive for "Headache, Incoordination, Loss of balance, Numbness, Poor coordination, Tingling." Tr. 346. Whether that review was based on Thomas's reports or objective results is unclear.

[4]The document at page 378 of the administrative transcript is from a report of an August 1, 2016, visit with Dr. Mayer after Thomas had been unable to raise his right arm for two weeks following a shoulder injection. Tr. 376. The beginning of the report states, "He does have some discomfort, but it's largely the problem with raising his arm it's causing an issue." Tr. 376. Based on a physical exam, Dr. Mayer wrote, "He is able to raise the arm out to approximately 30 [degrees], after that he requires assistance to lift it any further. It's not necessarily painful. He has weakness of the supraspinatus tendon." Tr. 378. Dr. Mayer assessed rotator cuff disorder and other diabetes-related impairments, prescribed medication, and referred him for an MRI and to orthopedic surgery. Tr. 378. Dr. Mayer wrote, "I think most likely he has a complete rotator cuff tear[.] We'll set him up for an MRI scan of the shoulder, and then he will want to see the orthopedist right after the scan." Tr. 379.

radicular left arm and leg pain and left upper extremity numbness and weakness," "worsening spasticity of his left arm," "left grip strength was only slightly decreased to 4/5 with trouble with fine finger movements," "EMG/NCV studies may be helpful in the upper extremities to evaluate whether there was acute radiculopathy versus compressive neuropathy that may be contributing to ongoing discomfort in left upper and lower extremities," "EMG needle studies were performed in April 2016 and demonstrated evidence of a mild C6 cervical radiculopathy. A left C6 TFESI (injection) was recommended for palliative purposes. The claimant reported improvement transiently following two injections in July 2016 records," Tr. 16–17). The ALJ observed that "July 2016 records also note reported pain in the right upper extremity, left upper extremity, right lower extremity, left lower extremity, back and shoulders. … [In August 2016], he also reported [to Dr. Mayer] that the problem largely involved raising his right arm. A complete AC tear was suspected and an MRI was planned. However, following this exam, there is no evidence of significant ongoing treatment[.]" Tr. 17.

Most of Thomas's shoulder complaints before July 2016 concern his left shoulder. Dr. Hussain first lists shoulder pain as a complaint in October 2015 for Thomas's left shoulder only. Tr. 503. Dr. Hurford's records generally reflect more complaints with Thomas's left extremity. Tr. 734, 737 (November 2015; 5/5 strength on the right, 4/5 or 5/5 on the left, normal grip on the right, and reduced grip strength on the left); Tr. 740, 742–43 (July 2015 active pain free range of motion in the right shoulder, limiting factors of pain in the left shoulder); Tr. 746, 748 (June 2015; same result as July). A May 2016 report from Dr. Collier documents Thomas's left upper extremity and neck pain and that Thomas was pleased with the relief from the last injection, which allowed him to turn his head more and drive better. Tr. 358. For right shoulder pain beginning in July 2016, Thomas received an injection, Tr. 369–70, leading to the complaint to Dr. Mayer about raising his arm.

As the ALJ observes, later records after August 2016 show no significant ongoing shoulder treatment. The only records beyond July 2016 are from Thomas's long-time providers, Dr. Hussain and Dr. Mayer. In March 2017, Dr. Hussain's office administered a left shoulder injection, Tr. 814, and in August 2017, the office administered bilateral shoulder injections, Tr. 793. Thomas's complaints otherwise generally focused on neck and back pain, *see, e.g.*, Tr. 754 (July 2018 appointment), and Dr. Mayer documented nothing significant about Thomas's shoulders between June 2017 and May 2018, Tr. 587–600. The evidence Thomas cites regarding flexion and extension—even assuming it concerns reaching—does not mean substantial evidence does not support the ALJ's finding. Because substantial evidence supports the limitations and the hypothetical adequately accounted for Thomas's reaching impairments, the vocational expert's testimony constitutes substantial evidence.

Remand to reconsider the RFC or step-five finding is unwarranted.

## B.   *Appeals Council Evidence*

Thomas contends the RFC fails to address limitations in an opinion from Stephan Esser, M.D.—an opinion provided not to the ALJ but to the Appeals Council. Doc. 19 at 15.

Dr. Esser worked with Dr. Hurford at Heekin Orthopedic Specialists. Tr. 39. In May 2015, Dr. Esser completed a "Florida Workers' Compensation Uniform Medical Treatment Status Reporting Form," apparently as part of the workers'-compensation-benefits process. Tr. 38–39. He diagnosed Thomas with cervical spondylosis with myelopathy. Tr. 38. He checked that diagnostic testing should be ordered, writing an MRI for the "cervical spine w/wout contrast" and "Lumbar spine without." Tr. 38. He checked that he would transfer care to a specialist and wrote Dr. Hurford's name. Tr. 38.

Under "The injured worker may return to activities so long as he/she adheres to the functional limitations and restrictions identified below, identify ONLY those

8

functional activities that have specific limitations and restrictions for the patient. Identify joint and/or body part," Dr. Esser wrote:

| Functional Activity | Load | Frequency & Duration | ROM/ Position & Other Parameters |
|---|---|---|---|
| ☐ Bend | | | |
| ☐ Carry | | | |
| ☐ Climb | | | |
| ☐ Grasp | | | |
| ☐ Kneel | —No lifting > 20 lbs. | | |
| ☐ Lift-floor > waist | | | |
| ☐ Lift-waist>overhead | | | |
| ☐ Pull | | | |
| ☐ Push | —No prolonged positioning > 20 minutes without | | |
| ☐ Reach – overhead | Ability to transition as needed. | | |
| ☐ Sit | | | |
| ☐ Squat | | | |
| ☐ Stand | | | |
| ☐ Twist | | | |
| ☐ Walk | | | |
| ☐ | | | |
| ☐ Other | | | |

Tr. 39.

The form states, "Any functional limitations or restrictions assigned above apply to both on and off the job activities, and are in effect until the next scheduled appointment unless otherwise noted or modified prior to the appointment date." Tr. 39.

Under "Patient has achieved maximum medical improvement," Dr. Esser checked both "No" and "Anticipated MMI date cannot be determined at this time." Tr. 39. Under "Is a residual clinical dysfunction or residual functional loss anticipated for the work-related injury," he checked "Undetermined at this time." Tr. 39. He wrote that Thomas would see Dr. Hurford for any follow-up. Tr. 39.

Thomas submitted this opinion and some other records to the Appeals Council. Tr. 34–51. The Appeals Council denied his request for review, Tr. 1, stating, "You submitted records from Imaging Center Network, dated June 4, 2015 to July 13, 2015 (13 pages). We find this evidence does not show a reasonable probability that it would

9

change the outcome of the decision. We did not exhibit this evidence."[5] Tr. 2. (The evidence is in the record at Tr. 34–51.)

In his argument about the RFC, Thomas contends, "In addition to plaintiff's upper extremity impairments, the functional capacity assessment ascribed to plaintiff fails to address limitations put forth by Stephan Esser, M.D. Evidence submitted to the Appeals Council indicates that plaintiff should have no prolonged positioning for more than 20 minutes without an allowance for weight transfer as needed (Tr. 39). (See also, Tr. 1–7, 14)." Doc. 19 at 15.

Elsewhere, Thomas states: "In the plaintiff's Complaint, he challenges both the decisions of the ALJ and the action of the Appeals Council. See also, sentence four of 42 U.S.C. § 405(g) and *Ingram v. Commissioner of Social Security*, 496 F.3d 1253, 1257 (11th Cir. 2007)," Doc. 19 at 2 (cleaned up); "Evidence submitted to the Appeals Council indicated that on May 21, 2015, Stephan Esser, M.D. ([a]ssociated with Heekin Orthopedic Specialists) recommended physical therapy and transferred plaintiff's care to Dr. Hurford (Tr. 38). Dr. Esser also limited the plaintiff to no lifting more than twenty pounds, no prolonged positioning more than 20 minutes without an allowance to transfer his weight as needed (Tr. 39)," Doc. 19 at 6.

Thomas cites no law on federal-court review of an Appeals Council's decision other than citing *Ingram*, without analysis, under "Procedural History." *See* Doc. 19 at 2.

By referencing Dr. Esser's opinion in a discussion of medical evidence and contending the RFC is inconsistent with the opinion, Thomas appears to challenge

---

[5]The Appeals Council also stated, "You submitted records from Rose Radiology – Largo, dated October 4, 2018 to November 13, 2018 (5 pages). The Administrative Law Judge decided your case through September 27, 2018. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before September 27, 2018." Tr. 2. The referenced evidence is not in the record, and Thomas does not discuss or otherwise challenge the Appeals Council's decision concerning these records. *See generally* Doc. 19.

10

the Appeals Council's decision to deny review by finding the evidence does not show a reasonable probability of changing the outcome. The Commissioner also construes Thomas's brief this way. *See* Doc. 21 at 11–13 (citing law on federal-court review of the Appeals Council's decision to deny review and addressing Thomas's arguments). The Commissioner also contends Thomas failed to show good cause for not submitting the evidence earlier. Doc. 21 at 13.

The Appeals Council did not err in finding that the evidence shows no reasonable probability of changing the ALJ's decision and therefore is not material. Dr. Esser's limitation to lifting no more than 20 pounds is consistent with light work in the RFC. Thomas interprets the statement, "No prolonged positioning [for more than] 20 minutes without ability to transition as needed," Tr. 39, as Dr. Esser's opinion that he must transfer weight when needed, Doc. 19 at 15. What the statement means is unclear; Dr. Esser wrote it mostly next to the "Pull" and "Push" activities but may have meant a sit/stand option. *See* Tr. 39. The Commissioner assumes the form was completed based on an in-person exam with Thomas instead of a review of medical records, Doc. 21 at 12, but the form does not specify. What is clear is that the form indicates the restrictions apply only until the next appointment as opposed to a long-term ability to work an eight-hour day, and Dr. Esser marked that Thomas also had not achieved maximum medical improvement, *see* Tr. 39. Considered with the other evidence on which the ALJ relied, Tr. 15–18, there is no reasonable probability the conclusory opinion on short-term limitations would change the RFC or the ultimate decision.[6]

---

[6]To preserve an issue for appeal, the party must raise the "specific issue to the district court" so that the district court has "an opportunity to consider the issue and rule on it." *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). Generally, this means that the issue must be plainly and prominently raised, with supporting arguments and citations to the evidence and to relevant authority. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014); *Morrison v. Comm'r of Soc. Sec.*, No. 15-14926, 2016 WL 4547171, at *3 (11th Cir. Sept. 1, 2016) (unpublished).

The Court does not construe Thomas's brief to challenge the Appeals Council's decision regarding the other evidence he submitted to it. Other documents include imaging

Remand to reconsider the additional evidence is unwarranted.

## C.     *Testimony on Pain and Limitations*

Thomas contends the ALJ erred in considering his testimony on pain and limitations. Doc. 19 at 16–20.

In evaluating a claimant's subjective complaints of pain or other symptoms, an ALJ must determine whether there is an underlying medical condition and either

---

studies from June 2015, ordered by Dr. Esser. Tr. 35–37. The cervical MRI results are otherwise discussed in medical reports in the record before the ALJ, *see, e.g.,* Tr. 342, and the ALJ discussed them in the decision, Tr. 17. And the lumbar MRI, Tr. 37, shows mild results consistent with other reports documenting lower back pain. Other documents are parts of reports from Dr. Hurford, Tr. 40–41, already in the record elsewhere, Tr. 744, 751. Another document is a June 2015 "Therapy Order" from Dr. Hurford referring Thomas to physical therapy, which was discussed in another report by Dr. Hurford, Tr. 751, and in the ALJ's decision, Tr. 16.

There is another opinion in the evidence submitted to the ALJ. In June 2015, Dr. Hurford completed the same worker's compensation form as Dr. Esser. Tr. 42–43. He diagnosed progressive cervical myelopathy. Tr. 42. He checked that a pre-existing condition contributed to the current medical disorder and that the findings represented an aggravation (progression instead of temporary worsening) of the condition. Tr. 42. Under "Management and Treatment Plan," he checked physical therapy and surgical intervention (writing in part C3–7 laminectomies). Tr. 42. Under "Functional Limitations and Restrictions," he checked: "The injured workers' functional limitations and restrictions, identified in detail below, are of such severity that he/she cannot perform activities, even at a sedentary level (e.g. hospitalization, cognitive impairment, infection, contagion), as of the following date," writing in "6/19/15." Tr. 43. Under "Patient has achieved maximum medical improvement," he checked "No." Tr. 43.

Thomas does not reference this opinion except in his conclusion at the end of his brief after repeating his RFC arguments: "Established Eleventh Circuit case law also holds that when a treating physician's opinion such as Dr. Hurford's or Dr. Esser's is improperly rejected, it is to be accepted as true as a matter of law. Dr. Esser's and Dr. Hurford's treating opinions concerning plaintiff's functional limitations are in fact supported by the objective evidence and are more than conclusory." Doc. 19 at 19 (cleaned up). By failing to provide adequate briefing, Thomas abandoned any argument that Dr. Hurford's opinion is material or should have otherwise been considered.

Thomas does not discuss Dr. Hurford's opinion in the facts or analysis and cites no law about a treating source's opinion. He arguably raised the issue concerning Dr. Esser's opinion because he referenced it in his argument (though there is no evidence to show he was a treating physician based on the one-time workers' compensation form), but not an issue concerning Dr. Hurford's opinion.

12

(1) objective medical evidence confirming the severity of the alleged symptom arising from that condition or (2) evidence the condition is so severe that it can be reasonably expected to cause the alleged symptom.[7] *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the objective medical evidence does not confirm the alleged severity of a claimant's symptom, but an impairment can be reasonably expected to cause that alleged severity, an ALJ must evaluate the intensity and persistence of the alleged symptoms and their effect on ability to work. 20 C.F.R. § 404.1529(c)(1). In doing so, an ALJ must consider all available evidence, including objective medical evidence, statements from the claimant and others, and any prior work history. 20 C.F.R. § 404.1529(c)(2)–(3). An ALJ also must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 404.1529(c)(4). If an ALJ finds a claimant's testimony about the intensity, persistence, and limiting effects of a symptom, such as pain, unsupported, she must provide "explicit and adequate reasons." *Holt*, 921 F.2d at 1223.

An ALJ must consider all relevant record evidence. 20 C.F.R. § 404.1520(a)(3). But, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks omitted).

The ALJ detailed Thomas's statements:

---

[7]Effective March 28, 2016, Social Security Ruling ("SSR") 16-3p rescinded a previous SSR regarding credibility of a claimant. SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017) (republished). The SSR removed "credibility" from policy because the regulations do not use that term. *Id.* at *2. The SSR clarified that "subjective symptom evaluation is not an examination of an individual's character" and provided a two-step evaluation process. *Id.* Because the ALJ issued his decision on October 15, 2018, the new SSR applies here. *See Hargress v. Soc. Sec. Admin.*, 883 F.3d 1302, 1308 (11th Cir. 2018) (holding new SSR did not apply when ALJ issued decision before the SSR effective date).

13

The claimant testified that he was on his wife's medical insurance. He stated that he last worked in 2016 and stopped because he was hit at the railroad by another driver in his back, and while doing tie down work. He stated that his doctors recommended different surgeries. He stated that he did not feel that he could do any type of work with his doctors' appointments and the medication that he was using. Tr. 14.

He stated that after his accident at the railroad, the doctors wanted to fuse his spine together and he was not sure if he wanted to have surgery or just sit and hurt. He stated that his diabetes medication also "tears his stomach up" and that he must skip doses. He also clarified that his stomach problems make it hard for him to get to the restroom and that his extended release medication lessens this problem some. He stated that he takes his medication for gout regularly but that if he is not having a flare-up, he will skip this medication for a day or two. He stated that he does feel these flare-ups coming on, and when they occur, he cannot put pressure on his knees or joints.

He reported that he had pain in his neck and lower back and reported that the pain goes into his left hand. He stated that his pain is constant, and that if he misses a medication dose, it is worse. He rated his pain as a 6 to 9 on a scale of 1 to 10, with 10 being the worst. He reported that his pain causes him to get up every 2 ½ to 3 hours at night. He stated that when he takes his pain medications, he ensures that he is at home because he will feel safe if he gets too drowsy or woozy, and he can sit or lay across the bed. He said that he takes pain medication every day. He stated that he must sit down 20 to 40 minutes after he takes his medication, and that he must sit or lay down for 3 to 4 hours. He stated that if he does not take his medication, he will feel throbbing pain every 15 minutes. He stated that he must take it easy between every four hours.

Functionally, the claimant reported that the longest he can sit varies between 10 and 15 minutes. The longest he stated he can stand is also 10 to 15 minutes. He stated that the longest he can walk is also about 10–15 minutes and that Hoffmans disease makes him veer to the left when walking. He reported difficulty using stairs and indicated that he was prescribed a cane the month prior to his hearing. He also testified that he was provided a temporary parking permit at the time of his 2015 work accident. He further testified that he just received a permanent parking permit in the month prior to his hearing.

The claimant reported that he lived with his wife and 28-year-old son and that his house has two floors. He testified that his bedroom is on the ground floor, and that there are 3 additional bedrooms upstairs in the

14

> house. On a typical day, the claimant stated that if he is not comfortable in bed he will go to his recliner, but does not go upstairs. He stated that he needs help dressing and bathing from his wife. He stated that his son, daughter or a neighbor will perform the household chores. He said that he does try to drive but that he is scared to do so. He said that he will take his time when driving to get to where he needs to go.

Tr. 14–15.

Addressing Thomas's statements, the ALJ stated:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are not entirely consistent because the objective findings, medical opinions, course of treatment, and overall evidence do not establish work preclusive impairments and symptoms for 12 continuous months. Rather, the evidence is consistent with a good response to a conservative treatment regiment after surgical intervention during the adjudicative period. Specifically, while Dr. Hurford initially recommended surgery after prior surgical intervention, and secondary to a cervical work injury in 2015; a post injury EMG revealed a mild C6 radiculopathy. The claimant also reported walking with his wife and riding his bike in November 2015 records despite his symptoms, which are activities consistent with the above [RFC] (Exhibit 2F/6). Furthermore, subsequent treatment records reveal that a different treating provider, Dr. Monteiro, reviewed both pre and post injury MRI's, and found that the claimant's reported symptoms were unrelated to the job related motor vehicle accident (Exhibit 3F/16). Since this reported finding in treatment records, the claimant's primary care physician, Dr. Mayer, has referred the claimant to Dr. Hussein, who has recommended that the claimant continue with ongoing palliative care management; and this treatment has consisted of injections and medication. The claimant has also testified to having private health insurance through his wife, which further suggests the efficacy of his treatment regimen. As such, the claimant's medical records, course and frequency of treatment, and overall evidence, are not consistent with work preclusive medically determinable impairments and symptoms for 12 continuous months since the alleged onset date.

Tr. 18.

Thomas contends the decision "evidences significant mistakes of fact" regarding the ALJ's consideration of the intensity, persistence, and limiting effect of

15

symptoms. Doc. 19 at 16. He explains the ALJ stated he had a good response to conservative treatment "after surgical intervention during the adjudicative period," Tr. 17, but he had no surgery during the relevant period; the report discussing biking and walking states he has worsening spasticity in his left arm and leg when doing those activities; the ALJ incorrectly stated Dr. Monteiro was a treating provider when he was only a consultative examiner for workers' compensation benefits with no medical reports in this record; and the ALJ incorrectly stated Dr. Mayer referred Thomas to Dr. Hussain instead of Dr. Collier. Doc. 19 at 16–17.

Thomas fails to show reversible error. The ALJ's statement about surgery appears just inartful; after an earlier surgery, Thomas had a good response to conservative treatment, including during the pertinent period. Omitting pain complaints during walking and biking does not render the ALJ's statement untrue, and walking and biking still tend to show he can do more than he contends. The ALJ was wrong about the referral by Dr. Mayer, but that fact is immaterial, and the ALJ accurately recounted that Dr. Hussain continued providing palliative care.

For the statement about Dr. Monteiro—"[S]ubsequent treatment records reveal that a different treating provider, Dr. Monteiro, reviewed both pre and post injury MRI's, and found that the claimant's reported symptoms were unrelated to the job related motor vehicle accident," Tr. 18—the ALJ cited the following information from an April 2016 appointment with Dr. Collier: "His work comp provider had obtained a second opinion by Dr. Monteiro who checked the before and after MRI scans and felt that his condition that needed surgery was present prior to his injury on the job and was not related to his job accident. Since that time period his benefits have been discontinued from his work comp injury," Tr. 366. As Thomas observes, the ALJ incorrectly refers to Dr. Monteiro a treating provider, and the ALJ's statement implies the second accident caused no injury or worsening of symptoms even though Dr. Monteiro's statement appears to mean merely that workers' compensation would not cover a surgery because of a pre-existing condition. Still, even setting aside this

16

reason, the other reasons the ALJ provided adequately support the pain finding.

Thomas contends the ALJ discounted Dr. Hurford's surgery recommendation and that surgery was denied under workers' compensation without inquiring into financial obstacles to surgery, instead assuming surgery was feasible because Thomas has insurance through his wife. Doc. 19 at 17–18. Thomas points to Dr. Hurford's statement that "[d]ue to documented progression of his cervical myelopathy, he needs to have the operation that we recommended. The longer that we wait, the less likely he is to have a full neurological recovery." *See* Doc. 19 at 18 (quoting Tr. 343). In the same appointment, Dr. Hurford also recommended surgery "[g]iven the ongoing symptoms, lack of response to conservative treatment and associated radiographic findings." Tr. 343.

Though Dr. Hurford recommended surgery and workers' compensation declined to cover the surgery because of a pre-existing condition, the ALJ's statements are fair. Thomas talked about surgery at the hearing and explained the option of accepting the surgery or having to "sit here and hurt" without detailing finances, Tr. 62. Though surgery might be the best option, the records show he continued to treat his symptoms with pain medication and injections, later stating he was uninterested in a surgical evaluation or intervention or participating in even physical therapy.[8] Tr. 369.

Thomas contends the ALJ "failed to clarify plaintiff's misunderstanding that a Hoffman's sign or reflex is a clinical test used to 'examine the reflexes of the upper extremities,' not one's walking ability." Doc. 19 at 18. This contention does not help Thomas; the ALJ did not use the statement as a reason to discredit his testimony.

Thomas argues, "the ALJ's criticism of the frequency and course of medical treatment is not accurately representative of the fact that the record documents at

---

[8]At the hearing, Thomas told the ALJ he did physical therapy once and it did not help. Tr. 76.

least 66 medical encounters during the adjudicated time period (41 months), averaging out to 1.6 medical counters a month." Doc. 19 at 18. That argument is not persuasive. Even before the second accident Thomas usually saw someone at the Institute of Pain Management at least once a month (at least in 2013 and 2014), Tr. 428. And other regular visits to Dr. Mayer did not always involve pain complaints. *See* Doc. 19 at 6 (citing Tr. 413–15 and Tr. 721–715 for two June 2015 visits to follow up on diabetes and take bloodwork or perform other tests).

Thomas contends the ALJ ignored that he explained pain prevents him from holding the communion bucket at church, participating in Boy Scouts, and having to lie down throughout the day. Doc. 19 at 18. Although the ALJ did not include all of those statements in her summary of his testimony, the ALJ need not refer to every piece of evidence, *see Dyer*, 395 F.3d at 1211, and her thorough summary of his testimony shows she considered his condition as a whole, including equivalent evidence about limitations (and specifically including Thomas's statement about having to lie down during the day, Tr. 15).

Remand to reconsider Thomas's statements is unwarranted.

## IV. Conclusion

The Court **affirms** the Commissioner's decision and **directs** the clerk to enter judgment for the Commissioner and against Charlie James Thomas, Jr., and close the file.

**Ordered** in Jacksonville, Florida, on September 30, 2020.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c: Counsel of record